IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| Kristen DIMEO, | |
| Plaintiff, | Civil No. 17-763 (RBK) |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the appeal of Plaintiff Kristen DiMeo for review of the final decision of the Commissioner of Social Security. (Doc. No. 1.) The Commissioner denied Plaintiff's application for Social Security Disability Insurance ("SSDI") benefits, finding Plaintiff was not disabled as defined by the Social Security Act. As explained below, the decision of the Commissioner is **AFFIRMED**.

**I.     THE FACTS**

**A. Procedural History**

On December 26, 2012, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits, alleging disability beginning January 7, 2012. The claim was denied initially on April 26, 2013, and upon reconsideration on July 18, 2013. Plaintiff then filed a request for a hearing, where she requested a closed period of disability from January 7, 2012 through November 15, 2013. In a decision dated July 1, 2015, the ALJ found that Plaintiff was not disabled. (R. 17-34.) On December 2, 2016, the Appeals Council denied her request for review. (R. 1-6.) Plaintiff then filed this action.

1

### B. Plaintiff's History

Plaintiff Kristen DiMeo suffers from bipolar disorder, migraines, spine disorders, anxiety disorders, affective disorders, and "alcohol addiction disorder." (R. 95-97.) Plaintiff alleges she was disabled and unable to work from November 17, 2011, when she lost her job at Delaware Valley Floral, to November 15, 2013, by which time her condition had sufficiently improved to begin working again full time. (R. 39-40.) During this period, Plaintiff worked at Duke Catering for two hours a day, five days a week, which increased to 15 hours a week in June of 2013. (R. 23.)

Plaintiff lives with her children, aged 8 and 10 at the time of the hearing before the ALJ. (R. 41.) She finished about 30 college credits but does not hold an Associate's degree. (R. 43.) The majority of her work history has involved payroll and benefits for companies as large as 700 employees. (R. 44-49.) She had worked for more than a decade as a payroll administrator. (R. 44.) Plaintiff has also worked in catering and cafeteria work, where she generally prepared lunches. (R. 45.) At the time of the hearing, Plaintiff was working from 18 to 24 hours per week doing payroll work, and had been doing so since November 2013. (R. 53.) However, she felt that she could not go beyond those hours due to her impairments. (R. 53.) Plaintiff has a driver's license and drives. (R. 65.)

Plaintiff alleges that her impairments had led directly to her losing her long-term position at Delaware Valley Floral, as in 2011 she had had an incident with another employee during a bipolar episode. (R. 56-57.) The incident, which Plaintiff describes as a "rage," led her employer to put her on leave. (*Id.*) Plaintiff states she has had similar incidents with family that have led her to "blowing up with them." (*Id.*) Shortly after returning to work, Plaintiff was laid off in January 2012. (R.22.) Thereafter, Plaintiff collected unemployment, which required her to certify that she

2

was willing and able to work. (R. 22, 27, 51.) Plaintiff also returned to work in September 2012, eight months later, on a part-time basis. (R. 41, 45, 61.)

At her administrative hearing, Plaintiff testified to twice-monthly hypomanic episodes followed by depression. (R. 58.) During these episodes, which lasted three to four days, Plaintiff would not sleep and would instead spend and clean excessively. (R. 58-60.) However, during the depressive episodes that followed, she would be unable to get out of bed and slept all day. (R. 59-60.) She testified that at times she could not even pull herself off the couch. (R. 60-61.) Plaintiff also testified that during the two-year period in question, her energy levels were very low, and she had suicidal thoughts, anxiety, and an inability to think clearly and concentrate. (R. 62.)

Plaintiff testified that her husband and in-laws were supportive during this time, despite the fact that she had paranoid ideation that her in-laws were going to take her children away. (R. 62-63.) Nonetheless, her in-laws cleaned her house, went grocery shopping for the family, and cared for her children. (R. 63.) At the hearing, Plaintiff stated her improvement had been a gradual one, with a great deal of fine-tuning of her psychiatric medications and slow progress; she had been increasing work and activities as her condition stabilized. (R. 53-54, 61, 63-64.) At the time of the hearing, the only activity Plaintiff did with her daughter is to be co-leader for her Brownie Girl Scout troop. (R. 64.)

### C.  Plaintiff's Relevant Medical History

We now review Plaintiff's medical history before Dr. Michael H. Bojarski, Dr. Francene Black, Barbara O'Brien, Dr. Lawrence G. Mintzer, Dr. Brady Dalton, and Dr. Jane Curran, among others.

*1. Dr. Bojarski*

Plaintiff began treating with Dr. Michael H. Bojarski for primary care in December of 2009. (R. 399.) On her initial visit, Dr. Bojarski noted "excessive constant crying" and began a trial of Cymbalta at 60 mg daily. (R. 374.) On March 29, 2010, Dr. Bojarski noted that Plaintiff was unable to stop crying, was really depressed, could not think straight, and noted that she felt everything was overwhelming and that she was unable to focus. (R. 371.) At that time he diagnosed Panic Disorder and prescribed Paxil, 40 mg daily, discontinuing the Prozac that she had been taking. (R. 369.) Some time after, on June 3, 2010, Dr. Bojarski noted he was "not sure if [the Paxil] is working." (R. 369.) Dr. Bojarski then added Abilify to Plaintiff's medication regimen. (R. 369.) The notes on this date also state that Plaintiff was attending group therapy sessions and had seen a psychiatrist. (*Id.*) Three weeks later, on June 24, 2010, Dr. Bojarski noted Plaintiff was also attending individual therapy sessions each week. (R. 368.) These measures did not resolve all of Plaintiff's concerns, though, and she continued to report severe anxiety attacks and poor sleep to Dr. Bojarski. (R. 367.) Dr. Bojarski appears to have considered that Plaintiff suffered from depression or bipolar disorder around July 29, 2010. (*Id.*)

On April 5, 2010, Dr. Bojarski opined that the Plaintiff could not work for a period from January 14, 2010 to April 5, 2010, based on symptoms associated with reactive anxiety disorder and reactive panic disorder. (R. 329.) Similarly, on June 10, 2010, Dr. Bojarski wrote that the Plaintiff could not work for a period from April 5, 2010 to August 1, 2010, based on the same symptoms. (R. 319.) On December 8, 2010, Dr. Bojarski also noted that Plaintiff had gained 23 pounds since her last visit, that she was still depressed, and that she had reportedly slept all of the last weekend. (R. 365.)

4

On Dr. Bojarski's referral, Plaintiff was seen by Dr. Scott Rosenberg at the Center for Sleep Medicine at Underwood Memorial Hospital. (R. 380-81.) Dr. Rosenberg conducted a sleep study, after which Plaintiff was diagnosed with Obstructive Sleep Apnea Syndrome and was prescribed CPAP/BiPAP therapy, treatments addressing sleep apnea. (R. 380.)

   2. *Dr. Black*

In 2010, Plaintiff began treating with Francene Black, M.D., a psychiatrist at the Center for Family Guidance. (R. 458.) Dr. Black conducted an initial psychiatric evaluation of Plaintiff on August 26, 2010. (R. 456-58.) She noted that Plaintiff had reported a long history of depression interspersed with highly energetic periods, during which Plaintiff overspent and did not sleep. (R. 456.) Dr. Black also noted Plaintiff's panic attacks, which Plaintiff reported started at age 30. (*Id.*) Dr. Black also reported that Plaintiff "sees shadows" when she got insufficient sleep, and "sometimes she hears music in her head." (*Id.*) Dr. Black also noted Plaintiff's suicidal ideation and that she had recently spent 5-6 weeks in intensive therapy in Kennedy Memorial Hospital. (*Id.*) Dr. Black's evaluation also detailed the numerous psychiatric medications that Plaintiff had tried without success. These pharmaceuticals include Cytomel, Paxil, Prozac, Pristiq, and Serafem. (*Id.*) Dr. Black's diagnosis was bipolar II depressed, post-traumatic stress disorder secondary to a 10-year abusive marriage, panic disorder, and drug and alcohol abuse. (R. 457-58.) Plaintiff was started on Depakote. (R. 458.) Dr. Black's findings are consistent with the findings of Lawrence G. Mintzer, Ph.D., who examined Plaintiff on March 20, 2013. (R. 459-63.) Dr. Lawrence concurred with the primary diagnoses of bipolar disorder, and found Plaintiff's limitations to be caused primarily by moderate to severe psychological problems. (R. 462.) In August, Dr. Black assigned Plaintiff a GAF score of 45; this increased to 50 in September 2010 and then 55 by October 2010. (R. 454-58.) In October 2010, Plaintiff had started taking Wellbutrin and was

5

feeling "pretty good." (R. 451.) Plaintiff continued to report improvements through February 2011. (R. 446-49.)

In April 2011, Plaintiff reported she stopped Lamictal and had one manic episode. (R. 444.) Her GAF scores were 49 and 50. (R. 444-45.) In May 2011, she once again reported she was doing well, was feeling better on Prozac, no longer had any panic attacks, and was not as sad and depressed as she was on Lamictal. (R. 443.) A mental state examination ("MSE") revealed that in June 2011, she reported a "little" depression but good sleep. (R. 442.) Her GAF was then 55. (R. 442.) In July 2011, Plaintiff reported she was depressed and overwhelmed with vacation packing. (R. 441.) An MSE was normal and revealed a euthymic mood; by August, her mood had improved. (R. 440-41.)

The advent of Hurricane Sandy in September 2011 marked a new decline in Plaintiff's mood, and her GAF score declined to 45. (R. 439.) During an examination the following week, she reported feeling better, and her GAF increased to 50. (R. 438.) Her score stayed around this level for the remainder of the year. (R. 434-36.)

In January 2012, Plaintiff reported that she had been laid off from work, but that it was not a big deal and that she felt better. (R. 433.) On MSE, she was alert and cooperative, with a depressed affect and sad mood. (R. 433.) Her GAF score was 50. (R. 443.) In February 2012, she reported that she felt like she was on a "roller coaster" and that her mood was erratic and she was missing work. (R. 432. An MSE revealed she was cooperative and that she had a full affect, better mood, and full speech. (R. 432.)

Treatment notes from an examination on January 5, 2012, indicated that Plaintiff wanted to return to work the following Monday, January 9, 2012. (R. 357.) On January 17, 2012, Plaintiff had been laid off from work upon her return, but she nonetheless planned to volunteer at a high

school since she was out of work. (R. 356.) She also reported she was walking on a treadmill. (R. 356.) On March 15, 2012, Plaintiff was depressed to the point that she "gave up eating." (R. 431.) Dr. Black's notes indicate Plaintiff was "up and down" by April 20, 2012, and had stayed up all night. (R. 430.) Plaintiff's mood swings continued in June of 2012 as well, when Dr. Black noted disorganized thinking and racing thoughts. (R. 429.) This was followed by "low energy" on August 3, 2012, and daytime tiredness on November 9, 2012 and January 3, 2013. (R. 47-73.)

In July 2013, Dr. Black completed a Medical Source Statement regarding Plaintiff's mental impairments. (R. 531-40.) She diagnosed Plaintiff as bipolar, severely depressed, and suffering from panic disorder and PTSD. (R. 532.) Plaintiff reported that she had been happily married to her second husband for ten years and that they had two children. (R. 457.) Dr. Black opined that the side effects of Plaintiff's medication could be expected to keep her off-task between 6% and 33% of an 8-hour workday. (*Id.*) She also found that Plaintiff was so fatigued she could not work more than 3-4 hours a day, and would likely need to be absent from work for more than four or more days a month because of her psychological impairments. (R. 539-40.) The Statement reported many symptoms, including suppressed appetite, mood disturbance, an inability to focus, memory impairment, and sleep disturbance. (R. 533.) Dr. Black felt that Plaintiff would be seriously limited and unsatisfactory in maintaining attention for a two-hour segment, sustaining an ordinary routine without special supervision, performing at a consistent pace, accepting instructions or criticism from supervisors, responding to changes in work routine, or dealing with the normal stresses of work. (R. 534.) Dr. Black further opined that Plaintiff could not make it through the day without interruptions from her psychologically-based symptoms. (*Id.*) Dr. Black also felt that Plaintiff would have been seriously limited in her ability to maintain socially appropriate behavior and

could not interact with the general public. (R. 535.) She found marked limitations in the activities of daily living, social functioning, concentration, persistence, and pace. (R. 536.)

### 3. Barbara O'Brien

Barbara O'Brien, LCSW, counseled Plaintiff in 2013-2014, several months prior to Plaintiff's alleged onset date. (R. 563-75.) During an initial evaluation, Plaintiff reported feeling depressed but that she did not know why. (R. 526.) An MSE revealed that Plaintiff was alert and fully oriented; had an anxious mood and affect; normal speech; goal-directed thoughts; suicidal ideation, but no plan or intent; normal attention and concentration; intact recent and remote memory; average intelligence; fair insight; and intact judgment. (R. 528.) She was assessed with a GAF score of 50. (R. 528.)

MSEs in November and December 2011 revealed an anxious mood and sad affect, but goal-directed thought processes. (R. 521.) MSEs in January and February 2012 reveal a depressed mood and anxious affect, but goal-directed thought processes, normal thought content, no suicidal or homicidal ideation, distractible attention and concentration, and intact insight and judgment. (R. 520-21.)

During an MSE on February 28, 2012, Plaintiff reported that she was volunteering as the costume director for her children's school play; other than an anxious mood and affect, her mental status was normal with goal-directed thoughts, normal thought content, no suicidal or homicidal ideation, normal attention and concentration, and intact judgment and insight. (R. 519.)

In May 2012, Plaintiff was in a good mood, reporting that she had been volunteering at her children's school in the hopes of getting a job there. (R. 516.) An MSE was identical to February 2012. (R. 516.) In June 2012, Plaintiff reported that she was looking forward to spending her summer at home with her children. (R. 515.) She also reported she was doing well, and that her

8

mother-in-law had a party for her birthday. (R. 515.) An MSE revealed a euthymic mood, anxious affect, goal-directed thoughts, normal thought content, no suicidal or homicidal ideation, normal attention and concentration, and intact judgment and insight. (R. 515.) During an MSE later that month, she reported the same, but with an anxious mood. (R. 514.)

In September 2012, Plaintiff reported she was working two hours a day in the cafeteria in her children's school. (R. 512.) An MSE was the same as the earliest one in June. (R. 512.) The death of her father-in-law in November 2012 seems to have saddened Plaintiff, but by December 2012, Plaintiff had a normal MSE and reported feeling "content with her life." (R. 510.)

A January 15, 2013 note from her states that Plaintiff's mood and affect were anxious, that Plaintiff was still stressed and was decompensating. (R. 575.) By the next visit, though, Plaintiff was normal, at a subsequent visit she was stressed and depressed again, followed by a reversion to euthymic normality, in keeping with O'Brien's diagnosis of bipolar disorder. (R. 572-74.) In March 2013, Plaintiff reported she was doing well and was working two hours per day. (R. 507.) In April 2013, Plaintiff reported that she was stressed over whether she would be approved for disability benefits. (R. 506.) An MSE revealed a depressed mood and sad affect, but was otherwise normal. (R. 506.)

### 4. Dr. Mintzer

Plaintiff was examined by Lawrence G. Mintzer, Ph.D., in March 2013 at the request of the state agency. (R. 459.) She reported she was currently working two hours per day at her children's school, and that she had been employed as a payroll administrator for 13 years until January 2012, when she was laid off. (R. 459.) Plaintiff reported she was unable to work because she could not concentrate and she was not organized, and that if she had a full-time job, her rage would return. (R. 459.) With regard to activities, Plaintiff stated that she cleaned, cooked, and did

9

all the household shopping. (R. 460.) She took care of the household bills. (R. 460.) She also regularly took her children to and from school, and helped them with homework. (R. 460.) Plaintiff also reported that she abused alcohol from the time she was a teenager to until 2010. (R. 460.)

An MSE revealed Plaintiff was oriented to person, place, and time; was well-groomed; had normal speech; was "a bit" depressed and had a mildly constricted affect, goal-oriented thought processes, and coherent speech; had no delusional thoughts, homicidal thinking, or phobias; and had good abstract thinking, a good fund of knowledge, a capacity to perform simple calculations, and good concentration. (R. 461-62.) She also could perform serial 7s with average speed and no errors, could spell "world" back and forth, and had fair impulse control, social judgement, and insight. (R. 461-62.) Dr. Mintzer assigned a GAF score of 58. (R. 462.)

     5. *State Agency Psychologists*

Dr. Brady Dalton, a state agency psychologist, reviewed Plaintiff on April 1, 2013. His review indicated that Plaintiff had only mild limitations in her activities of daily living, social functioning, concentration, persistence, and pace. (R. 83.) Jane Curran, Ph.D., another state agency psychologist, also reviewed the record and found that Plaintiff had mild limitations in her activities of daily living, moderate limitations in social functioning and in her concentration, persistence, and pace. (R. 98-99.) Dr. Curran also completed a mental residual functional capacity ("RFC") assessment. She opined that Plaintiff had no understanding and memory limitations; some moderate limitations in her ability to sustain concentration and persistence, but was not limited in her ability to carry out short and simple instructions, make simple work-related decisions, or sustain an ordinary routine without special supervision; had some moderate limitations in social interaction, but was not limited in the ability to ask simple questions or request assistance, or maintain socially appropriate behavior or adhere to basic standards of neatness and cleanliness;

and had some moderate limitation in the ability to respond to changes in the work setting, but no other adaptation limitations. (R. 101-03.) Ultimately, Dr. Curran opined that Plaintiff retained the capacity to meet the basic mental demands of unskilled work. (R. 103.)

### D. Plaintiff's Adult Function Report

In her Adult Function Report of January 27, 2013, Plaintiff indicated she had difficulties with understanding, memory, concentrating longer than five minutes, completing tasks, following instructions, and getting along with others. (R. 238-248.) She wrote that she does not follow written or spoken instructions very well during the manic or depressive episodes typical of her bipolar disorder. (R. 246, 248.) She also indicated that during these periods she does not get along with authority figures well, and that she does not handle stress or changes in routine. (R. 247-48.)

Plaintiff also reported that she cannot care for her children herself, requiring her husband's assistance to do so. (R. 242.) She admitted to sometimes going to her children's school for two hours to act as a lunch lady, but also indicated that her symptoms of depression can cause her to sleep all day at times. (R. 241-42.) Because of her limited ability to concentrate, tasks take longer to perform than otherwise, and household chores do not always get done because she becomes disorganized and overwhelmed. (R. 241-43.) Simply grocery shopping takes her 3-4 hours. (R. 244.) She does not dress or bathe regularly during manic or depressive episodes; she keeps her hair short so that she does not have to care for it. (R. 242.) Plaintiff also reports suicidal ideation during these periods, spending beyond her means, and difficult socializing. (R. 245-47.) Plaintiff cooks, cleans, shops, listens to music, watches television, and does household chores. (R. 222.) She also cares for her pet bird and goes to church regularly. (R. 245.)

### E. The ALJ's Decision

The ALJ followed the five-step sequential evaluation process for determining disability claims, and found that Plaintiff was not disabled on July 31, 2015. *See* 20 C.F.R. § 404.1520(a)(4). First, the ALJ deferred in finding whether Plaintiff had engaged in substantial gainful activity since January 7, 2012, proceeding to the next step of the analysis, where he determined that Plaintiff had the severe impairments of bipolar disorder and anxiety, but no severe physical impairments, and that she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app'x 1. (R. 23-25.) The ALJ then found that Plaintiff had the RFC to perform a full range of work at all exertional levels, but that she was limited to understanding, remembering, and carrying out simple instructions; only occasional contact with co-workers and the public; and workplace changes that were infrequent and gradually introduced. (R. 25-28.) The ALJ relief on testimony from a vocational expert who averred that although Plaintiff could not perform her past semi-skilled work during the relevant period, she was capable of performing other unskilled jobs that existed in significant numbers in the national economy. (R. 28-29.) The ALJ therefore found that Plaintiff was not disabled during the relevant period.

## II. STANDARD OF REVIEW

When reviewing the Commissioner's final decision, this Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the

Commissioner's decision if it is supported by substantial evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

### III.  DISCUSSION

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ used the established five-step evaluation process to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1520. For the first four steps of the evaluation process, the claimant has the burden of establishing his disability by a preponderance of the evidence. *Zirnsak v. Colvin*, 777 F.3d 607, 611–12 (3d Cir. 2014). First, the claimant must show that he was not engaged in "substantial gainful activity" for the relevant time period. 20 C.F.R. § 404.1572. Second, the claimant must demonstrate that he has a "severe medically determinable physical and

mental impairment" that lasted for a continuous period of at least twelve months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. Third, either the claimant shows that his condition was one of the Commissioner's listed impairments, and is therefore disabled and entitled to benefits, or the analysis proceeds to step four. 20 C.F.R. § 404.1420(a)(4)(iii). Fourth, if the condition is not equivalent to a listed impairment, the claimant must show that he cannot perform his past work, and the ALJ must assess the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404. 1520(e). If the claimant meets his burden, the burden shifts to the Commissioner for the last step. *Zirnsak*, 777 F.3d at 612. At the fifth and last step, the Commissioner must establish that other available work exists that the claimant is capable of performing based on his RFC, age, education, and work experience. *Id.*; 20 C.F.R. § 404.1520 (a)(4)(v). If the claimant can make "an adjustment to other work," he is not disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

Plaintiff makes three sets of arguments. First, Plaintiff argues the ALJ failed to provide a step-one determination. Second, Plaintiff argues the ALJ improperly rejected the opinions of treating physicians Drs. Black and Bojarski. Finally, Plaintiff argues the ALJ erred in his credibility findings.

### A. Any Error Attributable to the ALJ's Step One Analysis Was Harmless

Plaintiff argues that the ALJ erred by failing to make a definitive determination on whether Plaintiff had engaged in substantial gainful activity. Plaintiff is correct that the ALJ's decision is somewhat irregular—in a subheading, the opinion states that "Plaintiff has engaged in substantial gainful activity since January 7, 2012." (R. 22.) However, the ALJ also "defer[red] a finding of whether or not the claimant's work after onset constitute[s] substantial gainful activity." (R. 22.) Thus, the opinion is facially inconsistent, effectively stating both that the claimant had and had not

14

engaged in substantial gainful activity. However, two considerations lead this Court to find the ALJ did not actually find that Plaintiff had engaged in substantial gainful activity. Although the subheading states Plaintiff had engaged in substantial gainful activity, the ALJ's discussion clearly states he deferred finding that, and his more particularized analysis controls over a generalized statement. But more importantly, the ALJ clearly proceeded to the next part of the five-step analysis. This comports with the controlling regulations. *See* 20 C.F.R. § 404.1520 ("If we cannot find that you are disabled or not disabled at a step, we go on to the next step."). Had he found that Plaintiff had engaged in substantial gainful activity, the analysis would have stopped right there, and the next eight pages of his decision would have been meaningless surplusage. Thus, a commonsense reading of the ALJ's decision only permits a conclusion that he ultimately declined to decide on whether Plaintiff's work during her alleged disability period, such as her work as a caterer or as a cafeteria worker, was substantial gainful employment.

But there's a more central defect to this argument. Plaintiff's request is a mite absurd: she wants the Court to reverse an ALJ decision on the basis of a finding that was *beneficial* to her because it could have been more perfectly phrased. *See Coy v. Astrue*, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) ("No principle of administrative law "require[s] that we convert judicial review of agency action into a ping-pong game" in search of the perfect decision.") (citing *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)). Ultimately, the ALJ resolved step one in Plaintiff's favor. To the extent the ALJ made an error, it was not only harmless—it was helpful.

### B. The ALJ Had Substantial Evidence to Support His Conclusion

Plaintiff next argues that the ALJ failed to attach sufficient weight to the opinions of Drs. Black and Bojarski. An ALJ has a duty to consider all medical evidence placed before her and must provide an adequate reason for dismissing or discarding evidence. *Akers v. Callahan*, 997 F.

15

Supp. 648 (W.D. Pa. 1998) (citing *Wier on Behalf of Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984)). An ALJ must resolve conflicts in the evidence and cannot rely on a "single piece of evidence" that "will not satisfy the substantiality test." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). As a general matter, an ALJ must give more weight to the opinions of examining physicians over non-examining physicians, but "[a]n ALJ can reject a treating physician's opinion, and thus obviously a consultative examiner's opinion as well, where the opinion is (1) not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or (2) inconsistent with other substantial evidence of record." *Ramos v. Colvin*, No. CV 14-3971 (ES), 2016 WL 1270759, at *5 (D.N.J. Mar. 31, 2016) (citing *Kreuzberger v. Astrue*, No. 07-529, 2008 WL 2370293, at *4 (W.D. Pa. June 9, 2008) (citing 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2))). Ultimately, "an administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

The ALJ found that Plaintiff's own statements, "after careful consideration of the evidence," as well as Plaintiff's "demonstrated ability to work during her requested closed period of disability" weighed against the opinions of Drs. Black and Bojarski. Plaintiff argues, however, that SSR 96-2p, in effect at the time, compelled the ALJ to give controlling weight to a treating source's medical opinion if it was "well-supported and not inconsistent." However, Dr. Black's opinion that Plaintiff was incapable of working was nonetheless inconsistent with Plaintiff's own stated activities and averments that she was on unemployment and looking for work. (R. 27.)

The ALJ had a wealth of contradictory evidence before him; judging the evidence necessarily entailed discarding at least some of someone's expert opinion in order to reach a conclusion on Plaintiff's legal status. Ultimately, if the treating physician's opinion conflicts with other medical evidence, then the ALJ is free to give that opinion less than controlling weight or

16

even reject it, so long as the ALJ clearly explains her reasons and makes a clear record. *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 148 (3d Cir. 2007); *cf. Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC."). The ALJ did so, and clearly explained his reasoning.

With respect to Plaintiff's other arguments, we find they are without merit. Plaintiff argues that the ALJ made verboten "speculative inferences from medical reports," *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), specifically with respect to Dr. Black's opinions about Plaintiff during the relevant period. Nothing in the ALJ's decision supports that claim. The ALJ simply noted that Plaintiff had, in fact, worked in a reduced capacity after losing her job, and noted numerous instances where Plaintiff had "a fairly wide array of activities requiring substantially good abilities for maintaining concentration, persistence, attention and pace . . . [that] demonstrate that [she] is able to perform <u>unskilled</u> work tasks on a routine and sustained basis." (R. 28 (emphasis in original).) Plaintiff also argues that the ALJ impermissibly compared this evidence to Plaintiff's history of working during the period, but we find the ALJ did not err in considering this. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level."). Finally, to the extent that Plaintiff argues the ALJ failed to mention several items in his opinion, we do not find this to be error. With an expansive record of over 500 pages before him, it is plain that he could not enumerate every fact.

### C. The ALJ Did Not Err in the Determination of Credibility

Plaintiff next argues that the ALJ erred in finding Plaintiff not entirely credible. Credibility assessments involve a two-step process. First, the ALJ must determine whether there is an

underlying medically determinable impairment that could reasonably be expected to produce the plaintiff's symptoms. 20 C.F.R. § 416.929(b). If such an impairment is found, the ALJ must next evaluate the intensity, persistence, and limiting effects of the plaintiff's symptoms to determine the extent that they limit the plaintiff's ability to do basic work activities. 20 C.F.R. § 416.929(c). In evaluating the intensity, persistence, and limiting effects, the ALJ must consider all of the available evidence. *Id.* When statements about the intensity, persistence, or functionally limiting effects of symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on a consideration of the entire case record. 20 C.F.R. § 416.929(c)(4). The ALJ "can reject such claims if he does not find them credible." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999.) A reviewing court should defer to an ALJ's credibility determination, especially where he has the opportunity at a hearing to assess a witness's demeanor. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). *See also Hoyman v. Colvin*, 606 F. App'x 678, 681 (3d Cir. 2015) ("Credibility determinations of an administrative judge are virtually unreviewable on appeal.") (internal quotation marks omitted).

Plaintiff's exact argument is unclear, but we clear enough to be unavailing. The ALJ, with reference to the facts as presented in the record, found Plaintiff's claim that she was not able to perform even unskilled work during the period she claimed she was disable to be not entirely credible. This finding was supported by reference to a breadth of opinions and representations by Plaintiff herself. We see no reason to second-guess that determination now.

## IV. CONCLUSION

We will not disturb the Commissioner's decision. **AFFIRMED**.

Dated: March 23, 2018                                    /s Robert B. Kugler
                                                          ROBERT B. KUGLER
                                                          United States District Judge